UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TYWONNE NABORS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:11-CV-583 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On June 6, 2007, plaintiff Tywonne Nabors filed applications for disability insurance benefits, Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI ,42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of June 1, 2006. (Tr. 89-100). After plaintiff's application was denied on initial consideration (Tr. 43-47), she requested a hearing from an Administrative Law Judge (ALJ) (Tr. 53-54).

Plaintiff and counsel appeared for a hearing on June 16, 2009. (Tr. 19-42). The ALJ issued a decision denying plaintiff's claims on January 6, 2010 (Tr. 7-18), and the Appeals Council denied plaintiff's request for review on February 14, 2011. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 126-45), plaintiff listed her disabling conditions as lupus, fibromyalgia, joint pain and swelling, and a skin condition. She stated that her

joints were painful and swollen and it was difficult for her to bend or walk. Her skin condition caused light sensitivity and swelling in her eyes and face. She also complained of fatigue. She had worked as cashier, a food server, a housekeeper, and a laundry aide. She was taking Ibuprofen. (Tr. 133).

In her Function Report (Tr. 147-54), plaintiff stated that she got her children up for school in the mornings and made sure they got on the school bus. She then made phone calls, went to the library, and tried to exercise. She ate a meal and watched television while she waited for the children to come home. She took them to the park, fixed dinner and read. She indicated that she took care of her children's basic daily needs and did so without assistance. She had no problem with her personal care and was able to prepare simple meals, such as sandwiches and salads. She took care of household chores, including dusting, making beds, doing dishes, ironing clothes, sweeping and mopping. She went out as needed, four to five times a week, and walked or used public transportation. She shopped as needed. She was able to count change, pay bills, and handle a savings or checking account. She listed reading and watching television as her hobbies. She spent time with others and went to the library on a regular basis. She indicated that she had anxiety attacks and wanted to be left alone. Her conditions interfered with her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use her hands. She was able to walk a distance of seven blocks. Pain disrupted her sleep and fatigue interfered with her ability to concentrate and complete tasks, but she was able to follow written instructions well and spoken instructions fairly well. She indicated she had some trouble getting along with others and said that she reacted poorly to stress and required medication.

Plaintiff completed an updated disability report following the initial denial of her application. (Tr. 183-89). She stated that her conditions had worsened and that she was not sleeping well. She had to pay for her medications and the difficulty of doing so caused her anxiety and stress. She stated that there were times when she did not feel like getting out of bed and that she could stay in bed for two or three days at a time. Her appetite was poor and she was losing weight. With respect to her physical symptoms, she stated that her ankles occasionally swelled. Overall, she described herself as more withdrawn and wanting to be alone.

### B. <u>Hearing on October 14, 2009</u>

At the time of the hearing, plaintiff was 52 years old. She lived in an apartment with her husband and two of her seven children, ages 18 and 14 years old. Her husband had been unemployed for "the last couple of months." Plaintiff did not graduate from high school but obtained a GED. (Tr. 22-24).

Plaintiff testified that she was last employed in 2006 as a housekeeper, a position she held for three weeks. She had also worked in food service (for one month), laundry (for a year), and housekeeping (for two years). Her job in the laundry required her to frequently lift 45 to 50 pounds. Her work in housekeeping did not require her to lift more than 10 pounds but she did a lot of bending. She testified that she had also worked as a stocker and cashier in a Dollar Store and in fast-food service. She stopped working in 2006 because it put too much stress on her back, legs, feet, and joints. (Tr. 28). She did not have a diagnosis for her condition. Plaintiff also testified that she was unable to work due to anxiety and depression. She felt fatigued and was angry and withdrawn; she had crying spells once a day. She took medication

for her physical and emotional conditions but did not believe that they helped. She did not identify any side effects from the medication.

Plaintiff testified that her daily activities were dictated by "whatever the day brings forth." (Tr. 31). She got her son up for school, took care of her own hygiene, and then did whatever needed to be done. She did housework with help from her husband; she cooked occasionally. She went grocery shopping about once a month, and otherwise got her sons to do it. She hated crowds. She tried to sit outside, or read, or talk on the phone, though she indicated that she gets sleepy and tired so she "basically sit[s] around," doing "whatever." (Tr. 32). She relied on child support and food stamps to get by; she did not have health insurance.

In response to questions from her lawyer, plaintiff testified that she got angry every day. She said she thought about past events, including the sexual abuse she experienced as a child. She believed people were laughing at her or talking about her and she preferred to be alone. She stated that she heard voices a couple of times a week and thought about suicide occasionally. Her physician recommended that she participate in group therapy. She had what she described as panic attacks several times a day, when she became tired and needed to take a break. These episodes occurred when she was physically active. With respect to her physical symptoms, plaintiff testified that she experienced cramping and numbness in her legs after sitting for 15 to 20 minutes. Sometimes when she walked, her knee would not bend. She described spasms and swelling in her hands that made it hard for her to bend them and shoulder pain that affected her ability to reach.

Delores Gonzalez, M.Ed., a vocational expert, provided testimony regarding plaintiff's past work. Her work as a food server was classified as light and semi-skilled;

her work as a housekeeper, as plaintiff performed it, was classified as light and unskilled; her work as a laundry aide was medium and unskilled work; her work as a stocker was classified as heavy and semi-skilled; her work as an office cleaner was classified as heavy, unskilled work; and her work as a cashier was classified as light and semi-skilled. (Tr. 41). The ALJ did not pose any hypothetical questions to Ms. Gonzalez.

### C. Medical Evidence

Plaintiff was seen at the Washington University Medical School Division of Rheumatology on November 21, 2005. (Tr. 193). Plaintiff had a history of fibromyalgia, positive ANA,[1] and diffuse skin rash. She complained of diffuse pain that worsened with activity. The examiner noted that plaintiff had poor compliance in that she did not keep appointments and did not call for medication refills. On examination, plaintiff did not appear to be in acute distress and she did not have a rash, although she was diagnosed with folliculitis. She had diffuse trigger points throughout her body and it was thought that fibromyalgia was the primary source of her symptoms. She was restarted on Effexor and advised on the role of exercise and sleep in managing the disorder. Blood tests revealed a positive ANA but there was no evidence of lupus.

Plaintiff received medical care at Grace Hill Neighborhood Health Center and St. Louis Connect Care. On August 2, 2006, she complained of throbbing pain in her fingers, elbows, shoulders, and toes. She did not have any disturbance of appetite or sleep at that time. (Tr. 252-53). On September 19 and 21, 2006, she complained of

---

[1]The ANA, or antinuclear antibody panel, tests for the presence of substances produced by the immune system that attack the body's own tissues. http://www.nlm.nih.gov/medlineplus/ency/article/003535.htm (last visited on June 23, 2011).

achiness throughout her body with numbness in her hands and feet. (Tr. 249-50; 237). She rated her pain at level 6 on a 10 point scale. On December 11, 2006, she had a diffuse rash and "very bad" itching.

Between January and May 2007, plaintiff required treatment for an infected sebaceous cyst on her back. (Tr. 241, 226-36). After a period of treatment with antibiotics, the cyst was surgically excised. A treatment note from Grace Hill dated June 19, 2007, lists plaintiff's diagnoses as polyarthritis, anxiety, condylitis, and atopic dermatitis. (Tr. 239, 245-46). She complained of pain in her shoulders, hips, hands, feet, and elbows. She also reported disturbed sleep with fatigue, anxiety and sadness.

Elbert Henry Cason, M.D., completed a consultative medical examination on August 8, 2007. (Tr. 255-60). Dr. Cason noted that plaintiff had been treated for lupus many years earlier but was no longer on medication. She had a rash all over her body but it was not attributable to lupus. Her other conditions were fibromyalgia and swelling of the joints. Her medications included paroxetine hydrochloride,[2] and acetaminophen, with additional medications for her skin condition. On physical examination, plaintiff had full range of motion of the back with tenderness in the lumbar area. She did not have muscle spasm and straight leg raises were negative. She was able to heel- and toe-stand and squat. She had a normal gait and full ranges of motion at the hip, knee, ankle, cervical spine, shoulder, elbow, and wrist. She had good grip strength and muscle strength all over. Her neurological examination was normal and she could use her fingers to button clothes, write, or handle small tools.

---

[2]Generic name for Paxil, a psychotropic drug indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. See Phys. Desk. Ref. 1501-03 (60th ed. 2006).

She reported that she was able to climb a flight of stairs, walk for 10 blocks, and stand for 45 minutes. The remainder of the musculoskeletal examination was unremarkable.

Thomas D. Johns, Ph.D., completed a consultative psychological examination on August 8, 2007. (Tr. 261-66). Plaintiff reported that she had seven children, three of whom lived with her and her second husband. She left school in the 10th grade and later obtained a GED. She had had no involvement with the juvenile justice system. The longest time she had worked at any job was three years. She reported that she suffered from depression, with disturbance of her sleep and decreased appetite and energy. She stated that she was irritable and suffered from a loss of interest in her environment. She had occasional feelings of helplessness, hopelessness and worthlessness. Dr. Johns noted passive suicidal ideation with no actual plan. Plaintiff reported that she was a recovering addict and that the start of her depression coincided with quitting substance use six years prior. She started drinking alcohol at age 18. She reported that she used to drink at least a 12-pack of beer a day and had had at least one blackout. She had cravings for alcohol when she quit. She had also used rock cocaine, marijuana and amphetamines on a daily basis, with occasional use of heroin, PCP and hallucinogens. She had never injected substances or abused prescription pills. She had undergone inpatient treatment but had no ongoing participation in a 12-step program or outpatient treatment. Dr. Johns described plaintiff as animated with a good sense of humor, alert, spontaneous, coherent, relevant and logical. He diagnosed plaintiff with depressive disorder, not otherwise specified, currently moderate with nascent benefit from recently instituted medication. He also diagnosed her with pain disorder associated with psychological factors and her general medical condition. Finally, he diagnosed her with substance dependence in

sustained, full remission. He assigned plaintiff a Global Assessment of Functioning (GAF) score of 65.[3] With respect to work-related functioning, Dr. Johns opined that plaintiff would be "moderately to markedly impaired in her ability to complete simple tasks in a timely manner over a sustained period of time uninterrupted by symptoms related to depression and/or chronic pain. There appears to be a certain degree of anergia at this time." (Tr. 265). He opined that her prognosis was guarded due to chronic pain.

On August 31, 2007, Kyle DeVore, Ph.D., completed a Psychiatric Review Technique form. (Tr. 267-78). Based upon his review of the record, Dr. DeVore determined that plaintiff had a depressive disorder that did not rise to the level of a severe impairment. He opined that she had mild limitations in maintaining concentration, persistence, and pace. He imposed no other limitations. Also, he noted that plaintiff was not receiving any psychological treatment.

During an office visit to Grace Hill Health Center on November 16, 2007, plaintiff reported that she felt fatigued, sad, anxious, and irritable, and was experiencing insomnia. Paxil helped with the symptoms. (Tr. 280-84). She also had a rash and complained of limb pain.

On December 13, 2007, plaintiff participated in an intake interview at Hopewell Center. (Tr. 303-17). She reported that she was not happy and was having conflict with her spouse and children. She had had a brief period of treatment in 2001 and now wanted to resume treatment for mood swings and depression. She reported that

---

[3]A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

she felt sad and tearful. She was sleeping excessively and had decreased energy and poor appetite resulting in weight loss. Her symptoms had improved somewhat since she started Paxil. She described herself as withdrawn and isolated. She reported that she did not like people and was suspicious of others. She had been molested as a child by a stepfather and uncle; one of her brothers was in jail for molesting her children. She loved her children and was very attached to them. She had managed to keep them with her through periods of homelessness. The interviewer described plaintiff as communicating her needs and having a good common sense approach to the problems of daily life. She was diagnosed with recurrent depressive disorder and post-traumatic stress disorder; she was assigned a GAF score of 55.[4]

Plaintiff did not keep a scheduled follow-up appointment at Hopewell Center on January 31, 2008. She was re-evaluated on July 22, 2008. (Tr. 304). At that time, she reported that she felt closed in and overwhelmed. She was experiencing nighttime waking and appetite disturbance with weight loss. She described herself as angry a lot of the time with panic attacks around other people. She felt depressed, hopeless, and unaccomplished, with low motivation.

Plaintiff underwent a wellness examination at Grace Hill on March 19, 2009. (Tr. 330-32). The next medical appointment reflected in the record occurred on July 19, 2009. She complained of depression, with anhedonia and crying spells. She also had diffuse joint pain, but no swelling or weakness. Her atopic dermatitis was not active at that time.

---

[4]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

Paul W. Rexroat, Ph.D., completed a consultative psychological evaluation on October 6, 2009. (Tr. 348-56). Plaintiff reported that she was being treated by Rolf Krojanker, M.D., and taking Mirtazapine and Paxil for depression. She felt depressed, stuck, irritable and sad, and cried three or four times a week. She had sleep problems and was forgetful. She had low self-esteem. She stated that she did not trust others and had no close friends. Nonetheless, she had friends with whom she went to Bingo and stated she could get along with others in general. Dr. Rexroat diagnosed plaintiff with major depression, recurrent, moderate, and assigned a GAF of 55. He opined that plaintiff had no impairment in her ability to understand, remember, and carry out instructions; she was moderately impaired in her ability to interact appropriately with the public, co-workers and supervisors, and in her ability to respond to usual work situations or changes in a routine work setting.

Plaintiff was seen for medical care at the Myrtle Hilliard Davis Comprehensive Health Center on August 18, 2010. (Tr. 359, 367). Her psychoactive medications at that time included Cymbalta,[5] Seroquel,[6] and Mirtazapine. She was also taking an antihistamine, blood pressure medication, a steroid, and Darvocet. She was ANA negative. On September 15, 2010, it was found that plaintiff had lumbar, thoracic, and shoulder strain. (Tr. 361-62). She received prescriptions for Flexeril, benadryl and naproxen. On November 16, 2010, plaintiff complained of left shoulder and hip strain. (Tr. 363).

---

[5]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[6]Seroquel is indicated for the treatment of acute manic episodes associated with bipolar I disorder and schizophrenia. See Phys. Desk Ref. 691 (61st ed. 2007).

## III. The ALJ's Decision

In the decision issued on February 2, 2010, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through June 30, 2011.

2. Plaintiff has not engaged in substantial gainful activity since June 1, 2006, the alleged date of onset.

3. Plaintiff has the following severe impairment: major depressive disorder.

4. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform the full range of work at all exertional levels, with the following nonexertional limitations: she is limited to simple tasks or work with which she is already familiar; she is also limited to occasional interaction with the public, co-workers, and supervisors.

6. Plaintiff is able to perform her past relevant work.

7. Plaintiff was 49 years old, a younger individual, on her date of onset. At the time of the decision she was 50 and was closely approaching advanced age.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination because the Medical-Vocational Guidelines support a finding of "not disabled" whether or not plaintiff has transferrable job skills.

10. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from June 1, 2006, through the date of the decision.

(Tr. 12-17).

## IV. Discussion

To be eligible for disability insurance benefits, a claimant must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of

performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. Standard of Review

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

### B. Plaintiff's Allegations of Error

Plaintiff contends that the ALJ: (1) improperly determined her residual functional capacity (RFC); (2) erred by failing to make explicit findings regarding the mental demands of her past relevant work; and (3) improperly relied on the Medical-Vocational Guidelines to find that she could perform other work existing in the national economy.

#### 1. The ALJ's RFC Determination

The ALJ determined that plaintiff has the RFC to perform the full range of work at all exertional levels with the following nonexertional limitations: she is limited to

simple tasks or work with which she is already familiar; and she is limited to occasional interactions with the public, co-workers, and supervisors.

The Social Security Administration has stated that "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

With respect to plaintiff's physical capacities, the ALJ noted that her physicians had not imposed any restrictions on her physical activities. On examination, plaintiff was found to have full ranges of motion in her back and joints, with normal muscle strength and grip strength. She had a normal gait and straight-leg raising was negative. In addition, plaintiff told Dr. Johns that she could walk 10 blocks, stand for 45 minutes, and climb a flight of stairs. Her activities of daily living included cooking, cleaning, shopping for groceries, and walking to the library or park several times a

week. Plaintiff does not challenge the ALJ's RFC determination with respect to her physical capacities and that determination is supported by substantial evidence in the record as a whole.

Plaintiff argues that the RFC is inadequate because it does not include Dr. Johns's assessment that she would be "moderately to markedly impaired in her ability to complete simple tasks over a sustained period of time uninterrupted by symptoms related to depression and/or chronic pain." By contrast, Dr. Rexroat found that plaintiff had no impairment in her ability to sustain concentration and persistence in the performance of simple tasks.

The ALJ accorded greater weight to the opinion of Dr. Rexroat than to that of Dr. Johns. "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (quotation omitted). In this case, the ALJ provided no explanation for her decision to give greater weight to one opinion over the other. See Freeman v. Astrue, 2011 WL 241951, at *3, No. 4:10–cv–00485–NKL (W.D. Mo. Jan. 24, 2011) (ALJ cannot reject medical evidence for "no reason or for the wrong reason") (citation omitted). It is unclear whether any harm resulted: neither doctor was a treating physician whose opinion was presumptively entitled to greater weight under the regulations. See § 20 C.F.R. § 404.1527(c). Because the Court finds that this matter must be remanded for further proceedings, the ALJ will have an opportunity to amplify on the basis for the weight assigned to the two opinions.

### 2. Nonexertional Demands of Past Relevant Work

The ALJ determined that plaintiff had the following nonexertional limitations: she was limited to simple tasks or work with which she was already familiar and was limited

to occasional interactions with the public, co-workers, and supervisors.  The ALJ also determined that plaintiff had the ability to perform her past relevant work as a cashier, stocker, food server, housekeeper, and laundry aide.  As plaintiff points out, however, the record contains no evidence from which the ALJ could conclude that plaintiff's past relevant work satisfies the nonexertional limitations that the ALJ imposed.

An ALJ has an obligation to "fully investigate and make *explicit* findings as to the physical and medical demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before [the ALJ] determines that she is able to perform her past relevant work." Groeper v. Sullivan, 932 F.2d 1234, 1238 (8th Cir. 1991) (emphasis in original; citation omitted).  Furthermore,

> for a claim involving a mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

Social Security Ruling (SSR) 82-62, 1982 WL 31386, *3.

In this instance, the ALJ received testimony from the vocational expert regarding the exertional requirements and skill levels of plaintiff's past relevant work but did not ask about the degree of interaction with others required to perform these jobs. Accordingly, the ALJ's determination that plaintiff could return to her past relevant work is not supported by substantial evidence on the record.

### 3. The ALJ's Use of Medical-Vocational Guidelines

Plaintiff argues that the ALJ committed reversible error by relying on the Medical-Vocational Guidelines to determine that she is not disabled.  "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry [his] burden by referring to the medical-vocational guidelines

to occasional interactions with the public, co-workers, and supervisors.  The ALJ also determined that plaintiff had the ability to perform her past relevant work as a cashier, stocker, food server, housekeeper, and laundry aide.  As plaintiff points out, however, the record contains no evidence from which the ALJ could conclude that plaintiff's past relevant work satisfies the nonexertional limitations that the ALJ imposed.

An ALJ has an obligation to "fully investigate and make *explicit* findings as to the physical and medical demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before [the ALJ] determines that she is able to perform her past relevant work." Groeper v. Sullivan, 932 F.2d 1234, 1238 (8th Cir. 1991) (emphasis in original; citation omitted).  Furthermore,

> for a claim involving a mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

Social Security Ruling (SSR) 82-62, 1982 WL 31386, *3.

In this instance, the ALJ received testimony from the vocational expert regarding the exertional requirements and skill levels of plaintiff's past relevant work but did not ask about the degree of interaction with others required to perform these jobs. Accordingly, the ALJ's determination that plaintiff could return to her past relevant work is not supported by substantial evidence on the record.

### 3. The ALJ's Use of Medical-Vocational Guidelines

Plaintiff argues that the ALJ committed reversible error by relying on the Medical-Vocational Guidelines to determine that she is not disabled.  "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry [his] burden by referring to the medical-vocational guidelines

or 'Grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). However, the Eighth Circuit has held that "where a claimant ha[s] a severe mental impairment and [can] not return to her past relevant work, it [is] inappropriate for the agency to rely upon the grids to meet its burden at step five." King v. Astrue, 564 F.3d 978, 979 (8th Cir. 2009).

Defendant argues that the ALJ's error is harmless because she determined that plaintiff could return to her past relevant work and therefore did not need to reach step 5. Because the ALJ's decision regarding past relevant work is not supported by substantial evidence, the error at step 5 is not harmless.

## V. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 9th day of July, 2012.